# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

|  |  |  |
|---|---|---|
| ROSE SPENCER | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  13-cv-1487 |
| | ) | |
| | ) | |
| CAROLYN COLVIN, | ) | |
| Commissioner of Social Security | ) | |
| Defendant. | ) | |
| | ) | |

# O R D E R  &  O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 11) and Defendant's Motion for Summary Affirmance. (Doc. 14). For the reasons explained below, Plaintiff's motion is denied and Defendant's motion is granted. The decision of the Administrative Law Judge (ALJ) to deny Plaintiff Social Security Disability benefits is affirmed.

## BACKGROUND

### I. *Procedural History*

On November 16, 2009, Plaintiff Rose Spencer applied for disability insurance benefits and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, claiming that she had become disabled as of October 2006. (R. at 149-54).[1] She said that she became disabled because of "bipolar disorder, learning disability, and blackout spells resulting in a fear of people, anger

---

[1] Citation to R. at ___ refers to the page in the certified transcript of the entire record of proceedings provided by the Social Security Administration.

issues, difficulty sleeping, difficulty concentrating, and difficulty completing tasks." (R. at 83). The Social Security Administration initially denied her application on March 30, 2010. (R. at 79-83). Plaintiff filed for reconsideration on May 15, 2010 (R. at 84), and was again denied on August 4, 2010. (R. at 85-92). On September 3, 2010, Plaintiff requested a hearing before an ALJ. (R. at 95). ALJ Stephen M. Hanekamp held a hearing on April 12, 2012, in which Plaintiff, represented by her attorney, appeared and testified. (R. at 40-74). On June 26, 2012, the ALJ issued an opinion finding that Plaintiff was not disabled and thus not eligible for disability insurance benefits or SSI. (R. at 20-33). On August 21, 2012, Plaintiff requested that the Appeals Council review the ALJ's decision. (R. at 10). The Appeals Council denied Plaintiff's request for review on September 6, 2013, thereby making the ALJ's decision the final decision of the Commissioner of Social Security. (R. at 1-3). Plaintiff then filed her Complaint (Doc. 1) with this Court on October 17, 2013.

## II. *Relevant Medical History*

Plaintiff is currently a twenty-nine year old woman with a ninth or tenth grade education, which she received through a special education program. (R. at 44). Her relevant medical history consists primarily of treatment at North Central Behavioral Health Systems, Inc. ("North Central"), where she was a patient of Dr. Scott Wright and Dr. Atul Sheth, and as of the filing of this lawsuit, has been a client of Licensed Clinical Professional Counselor Pam Helms. (R. at 432, 469, and 741-67). According to Plaintiff's treatment notes from North Central, Plaintiff has also received treatment from Gretchen Fawcett, a physician's assistant. (*See, e.g.,* R. at 716, 722). However, the record does not contain records of Plaintiff's treatment

from Ms. Fawcett. The record also contains treatment records from McDonough District Hospital, where Plaintiff was admitted on December 2, 2009 after she walked in front of a large truck while under the influence of alcohol. (R. at 507-62).

Plaintiff was also evaluated by four non-treating sources who are relevant to this action: Mario Di Biase, Psy. D., Frank Froman, Ed. D., Jeanne Yakin, Ph.D., and Joseph Mehr, Ph.D.

For ease of review, this Order and Opinion reviews records from Plaintiff's treating sources before reviewing records from Plaintiff's non-treating sources, even though this slightly disrupts the chronological order of Plaintiff's treatment history.

## A. Plaintiff's Treating Sources

Beginning in April of 2008, Plaintiff began receiving treatment from North Central Behavioral Health Systems, Inc., (R. at 414), where she continued meeting with clinical staff through the pendency of her social security application and appeal. (*See* R. at 741-767 (medical records from North Central from June 27, 2011 through March 2, 2012)). Plaintiff had been sentenced to thirty-months of probation for possession of cocaine (R. at 416), and began receiving treatment at North Central at the request of her probation officer. (R. at 414).

Pam Helms conducted Plaintiff's initial psychosocial assessment. (R. at 419). Plaintiff stated to Helms that "she has a problem with marijuana," and said she smokes it because "it helps her relax and she has a lot of anger and anxiety." (R. at 414). At the time, she reported that her children were living with her father. (R. at 415). During the assessment, Plaintiff "was very guarded." (R. at 421). She reported "that she has always been in trouble with the law and feels authority figures pick

on her." She said that she felt that "if she ha[d] the right medication she would not need to smoke pot." Helms noted that during the intake, Plaintiff was oriented to time, place, person, and situation, and had an appropriate facial expression, dressed appropriately, and appropriate affect. (R. at 420). She had increased motor activity with pressured speech, and had fair insight but poor judgment. (*Id.*).

Plaintiff returned to North Central on July 28, 2008 for a psychiatric evaluation conducted by Dr. Scott Wright. (R. at 432). Plaintiff complained about the fact that she "can't hold down a job because she has anger outbursts and then quits abruptly, " among other things. (*Id.*). She complained that she has "more bad days than good days," and said her moods are more "irritable and angry than sad, and more sad than nervous." (*Id.*). Dr. Wright diagnosed her with bipolar affective disorder, intermittent explosive disorder, marijuana abuse, and alcohol abuse. (R. at 433). He prescribed Lamictal, to be taken twice a day. (R. at 434).

Plaintiff stopped treatment in September 2008 after attending two counseling sessions because she was incarcerated. (R. at 438). Her case notes indicate that she had stopped taking Lamictal. (*Id.*).

She returned for treatment in July of 2009. (R. at 450). At that time, she was not under a doctor's care and was not taking medication. (R. at 451). The intake notes indicate that Plaintiff received support from her family and was able to maintain a residence and obtain or maintain employment. (R. at 452-53). She experienced discomfort in social situations and difficulty in forming and maintaining relationships. (R. at 453). According to the report, she said "she would like to find a medication and treatment that will help her with her anger and mood

swings." (R. at 455). Helms noted that Plaintiff "seems more mature and ready for treatment." (*Id.*).

On August 27, 2009, Plaintiff had an initial psychiatric visit with Dr. Atul Sheth at North Central. (R. at 469-78). He diagnosed Plaintiff with mood disorder, intermittent explosive disorder, signs of bipolar disorder, and borderline personality disorder. (R. at 477). He prescribed a daily 15 milligram dose of Abilify, an anti-psychotic meant to treat symptoms of schizophrenia and bipolar disorder, and a daily 100 milligram dose of Trazodone, an anti-depressant meant to treat depression and sleep disturbances. (R. at 479-80).

Plaintiff returned to North Central on October 19, 2009 for a routine follow-up. The treatment notes reflect that she blamed all of her symptoms on Abilify. (R. at 488). At that time, Dr. Sheth reported that her "symptoms are somewhat better." (R. at 489). Dr. Sheth prescribed Depakote, an anti-convulsant, to be taken twice-daily – 250 milligrams in the morning and 500 milligrams in the evening – for mood stabilization. (R. at 492). She began taking clonidine on October 28, 2009. (R. at 498). At an appointment on November 16, 2009, Dr. Sheth reported that Plaintiff was not compliant with her medication, "blames all symptoms on Abilify," "took one dose of depakote," and was "not taking clonidine." (R. at 499). Even so, he noted that her symptoms were somewhat better. (R. at 500). Dr. Sheth took Plaintiff off of Abilify, prescribed Elavil, and kept Plaintiff on Clonidine, and Trazodone. (R. at 503-504).

On December 2, 2009, Plaintiff was admitted to McDonough District Hospital, where she was discharged on the same day. (R. at 508). At discharge, the

hospital diagnosed her with alcohol intoxication and a possible suicide attempt. (*Id.*). Plaintiff arrived at the hospital with a blood alcohol level of 0.27%. Police told hospital staff that she "tried to walk out in front of a semi and they felt that she was doing this on purpose." (*Id.*). The hospital admitted Plaintiff into the Intensive Care Unit and monitored her until her blood alcohol level was 0.0%. (*Id.*). Once Plaintiff was sober, she denied that she was trying to hurt herself. (*Id.*).

Plaintiff returned to North Central on March 4, 2010 to meet with Helms. (R. at 601-02). Helms noted that "Rose continues to have mood swings, issues with anger, and is easily frustrated. This makes it very difficult for Rose to maintain employment . . ." (R. at 602). She noted that several of the medications Plaintiff's doctors prescribed cause side effects. (*Id.*). Plaintiff met with Dr. Sheth on April 19, 2010. (R. at 603-08). At that time, Dr. Sheth took Plaintiff off of Elavil, Clonidine, and Trazodone, and prescribed Remeron. (R. at 604, 612-13). Again, he noted that Plaintiff's symptoms were somewhat better. (R. at 605). Plaintiff had a routine follow-up with Dr. Sheth on July 19, 2010. Dr. Sheth noted that Plaintiff was still having trouble sleeping, but also noted that Remeron helped her mood. (R. at 658). He prescribed Vistaril (R. at 664).

On July 12, 2010, Helms completed a Psychosocial Assessment. (R. at 641-53). The assessment noted that Plaintiff's "current living situations/strengths" included caring for her own nutritional needs, cooking, using the post office, caring for her own grooming or hygiene, caring for her own medical needs, housekeeping, shopping, and using the telephone. (R. at 644).

On August 26, 2010, Helms noted that "Rose continues to have mood swings, issues with anger, and is easily frustrated. This makes it very difficult for Rose to maintain employment. She has difficulty getting aloing [sic] with others and has short term relationships. I have closed Rose to substance abuse but she is remaining in treatment for bipolar disorder." (R. at 663).

On October 11, 2010, Plaintiff met with Dr. Sheth for a routine follow-up. During this appointment, both Plaintiff and Dr. Sheth noted that her symptoms were somewhat better. (R. at 665). He increased her dosage of both Remeron and Vistaril. (*Id.*). Plaintiff stopped taking her medications in November 2010, once she learned that she was pregnant. (R. at 670). Her OB/GYN prescribed Wellbutrin "and something to help her sleep" shortly thereafter. (R. at 671).

Plaintiff continued to meet with Helms during her pregnancy. On December 29, 2010, Helms conducted a Level of Care assessment and concluded that Plaintiff had a serious impairment in her level of care with respect to her functional status. Specifically, the report noted "[s]erious deterioration of interpersonal interactions with consistently conflictual or otherwise disrupted relations with others," and "inability to perform close to usual standards in school, work, parenting, or other obligations." (R. at 684-85). Later, in July 2011, Helms upgraded Plaintiff's functional ability from serious to moderate, and noted "significant deterioration in ability to fulfill responsibilities and obligations to job . . ." (R. at 694).

Plaintiff began seeing Gretchen Fawcett, a physician's assistant, in September 2011 (R. at 716). At that time, she was still only taking Wellbutrin. Helms consulted with Fawcett about Plaintiff's medication on December 12, 2011.

(R. at 722). Helms's notes reflect that Plaintiff began taking Effexor on December 21, 2011. (R. at 723). Although these notes to do not reflect that Fawcett also prescribed Xanax, later notes suggest that she did. (*See* R. at 754). The notes also reflect that Dr. Sheth was no longer treating Plaintiff at that time. (*Id.*). Helms's case notes reflect that Plaintiff benefited the Xanax and Effexor. (*Id.*). In January 2012, Plaintiff said she was compliant with her medications and they were "really helping her stay calm." (*Id.*).

As part of Plaintiff's application for benefits, Helms submitted two identical Medical Source Statements – the first dated December 13, 2010 (R. at 673-75), and the second on March 2, 2012. (R. 679-81). In them, Helms opined that Plaintiff's ability to understand, remember, and carry out instructions and her ability to interact appropriately with supervisors, co-workers, and the public were affected by her impairments in a number of marked and extreme ways. (*Id.*). Helms identified Plaintiff's diagnoses of intermittent explosive disorder, bipolar disorder, and manic borderline personality disorder, explained that Plaintiff is easily frustrated, has anger outbursts, does not trust others, and has an inability to both take orders and work alone.  (*Id.*). She based her opinion on "numerous therapy sessions." (*Id.*).

### B.  Plaintiff's Non-Treating Sources

Plaintiff was also evaluated by four relevant non-treating sources as part of her various applications for benefits.

#### 1.  Mario Di Biase, Psy. D.

Plaintiff was evaluated by Mario Di Biase, Psy. D. on March 14, 2003, as part of a previous application for benefits. (R. at 304-310). She reported to Dr. Di Biase

that she had "long standing problems with attention and concentration, and she noted that she carries a diagnosis of Attention Deficit Hyperactivity Disorder." (R. at 304). She also said that she "feels depressed a lot" and "experiences problems with sad mood, tearfulness, sleeping, low self-esteem, decreased energy, poor appetite, and social isolation." (*Id.*). At the time, she was not taking any medication, although she had previously taken Ritalin. (*Id.*). She reported that she was "independent for her activities of daily living." (R. at 305). She said she spent most of her time caring for her son and some of her time watching television. She also said she helps her mother with grocery shopping. (*Id.*).

Dr. Di Biase conducted a number of tests, and concluded that her "overall level of intellectual functioning [fell] within the Low Average Classification." He also concluded that her presentation was "suggestive of Dysthymic Disorder." (R. at 309-310).

### 2. Frank Froman, Ed. D.

As part of a more recent previous application for benefits, in which she complained of depression and learning disabilities, Frank Froman, Ed. D. conducted a Mental Status Examination of Plaintiff. (R. at 378). Plaintiff complained "about feeling anxious around others," and said she often feels paranoid. (R. at 380). At the time, she was not taking medication. Dr. Froman noted that she was "casually and neatly attired . . .Hygiene was adequate." (R. at 378). During the consultation, Plaintiff reported periodic episodes of feeling like she was going to pass out, and also reported one seizure. (*Id.*). Dr. Froman observed that she "related in a somewhat anxious manner." She had a "fairly good" ability to relate and had "a

sense of hypomania about her. Her speech was voluminous, with a great many asides." (R. at 379).

Plaintiff reported to Dr. Froman that she often cut herself when she was younger and still feels tempted to do the same. (*Id.*). She said she socializes "with some friends, all of whom are 'bipolar.'" (*Id.*). She said that she sleeps "a great deal," including sleep at unusual times. (*Id.*). At the time she said that she was working at the Village Inn in Quincy, Illinois, but feared she would lose her job because she lost her car and had no way of traveling to work. (*Id.*). During the day, she said she does routine chores. (*Id.*).

Dr. Froman oriented Plaintiff three times and concluded that she was "in good contact with reality." (*Id.*). She was able to conduct certain math processes, but not others, and she could explain analogies and idioms. (R. at 379-80).

Dr. Froman diagnosed Plaintiff with Social Anxiety Disorder, ADHD, and Borderline Personality Disorder. (R. at 380). He identified Plaintiff's current stressors as "lack of transportation; money; unresolved mental health issues – moderately severe." (*Id.*). He concluded that she was "quite able to perform one and two step assemblies at a competitive rate," but limited her to "being only with a few" co-workers and supervisors because "[s]he becomes readily overwhelmed when she is around too many people." (*Id.*) He wrote that "[s]he seems able to withstand the stress associated with customary employment of the kind that she has had in the past." (*Id.*).

### 3. Jeanne A. Yakin, Ph.D.

Jeanne A. Yakin, Ph.D. conducted a psychological review of Plaintiff on March 8, 2010. (R. at 563). In her report, Dr. Yakin reviewed Plaintiff's history of illness, her personal and family history, and her activities of daily living. She then conducted a mental status examination of Plaintiff, before assessing her ability to function in a workplace (R. at 563-68). Plaintiff described her "current problem or condition" by telling Dr. Yakin, "I don't know if it's that I can't work but my mind plays tricks on me and tells me to leave the job because people don't like me." (R. at 563). Dr. Yakin identified major symptoms as "difficulty securing and sustaining employment, distorted thoughts, [and] difficulty sleeping." (R. at 563-64).

Dr. Yakin reviewed Plaintiff's work history. Plaintiff identified five periods of employment from 2005 through 2008. (R. at 564). Plaintiff said her last job was at Bowers, an assembly factory, where she assembled and fixed machines. She said she worked there for approximately one month, but left during her shift on day and "went home and cried." (*Id.*). Plaintiff said that although she "liked the job," her mind told her to "leave – everybody's staring at you." (*Id.*). However, Plaintiff told Dr. Yakin that she would like to work again, but was hindered by her criminal record. (*Id.*). She said, "I'm a three-time felon . . . and it's hard for a felon to get a job. I've applied at a lot of places but they never call me back." (*Id.*). She told Yakin that although she gets "weird thoughts and quit even if I want to keep the job," she plans to return to work and was applying for jobs. (*Id.*).

Dr. Yakin also recorded Plaintiff's activities of daily living. (R. at 565). Plaintiff reported that she gets up each morning at 7:00 AM, and begins the day by

"playing games on the internet, getting her son up for school, making breakfast and sending him to school, then cleaning the house." (*Id.*). She watches TV at lunch, and then waits for her son to return from school, helps him with homework, and cooks dinner. During the evening, she watches TV, cleans the house, makes sure her son showers, and goes to bed. Plaintiff told Dr. Yakin that she goes to bed by 10 PM but doesn't sleep more than "two or three hours" a night. (*Id.*).

Dr. Yakin described Plaintiff as "pleasant and stable," and said her affect "was appropriate and consistent with the content of the conversation." (*Id.*). Plaintiff told her, "If I'm by myself or with my kids, I'm ok cause I'm at home with my kids, but if I go somewhere I just feel like I don't belong there, like people are whispering behind my back and I get angry and leave." (*Id.*).

Dr. Yakin concluded that Plaintiff was "oriented to person, place, time, and purpose of visit to office," had a poor digit span, poor short-term memory, a limited vocabulary, and good judgment regarding "a variety of comprehension probes." (R. at 566). She was able to "draw various geometric shapes," including simple and more complex shapes, but "failed to correctly draw the face of a clock" at directed hour and minute hand positions. (*Id.*).

Ultimately, Dr. Yakin concluded that Plaintiff was "cognitively capable of performing" simple one or two-step instructions. (R. at 567). Yakin relied upon Plaintiff's "[g]ood judgment and comprehension and fair performance on drawing exercises." She specifically noted that Plaintiff "reported no history of losing employment due to an inability to carry out instructions." Dr. Yakin discounted Plaintiff's contention that she cannot sustain employment because of "distorted

thoughts about [others'] impressions of her." (*Id.*). She wrote, "It is this provider's opinion that the claimant does have low frustration tolerance but that she is able to control her anger when necessary." (*Id.*). Dr. Yakin suggested that if Plaintiff suffered from an inability to tolerate other people of the intensity she reported to her, it would "generalize across situations" and also affect her relationship with her family and children in a manner that Plaintiff did not report. (*Id.*). Dr. Yakin wrote that Plaintiff exhibited "some social traits that may interfere with interactions to a mild to moderate degree," but concluded on the basis of Plaintiff's positive relationships with her family members and friends that she has "an ability to interact appropriately when motivated to do so." (*Id.*).

### 4. Joseph Mehr, Ph. D.

Plaintiff's last relevant consultative exam was conducted by Dr. Joseph Mehr on March 25, 2010. (R. at 570). Mehr based his medical disposition on category 12.04 (Affective Disorders) and 12.09 (substance abuse disorders). He did not base his medical disposition on category 12.08 (personality disorders).[2] (*Id.*). Dr. Mehr concluded that Plaintiff's activities of daily living were moderately restricted, that she had moderate difficulties in maintaining social functioning, and had moderate difficulties in maintaining concentration, persistence, or pace. (R. at 580). His opinions were based on a review of records from McDonough hospital and the North Central, Plaintiff's school records, and consultative reports from Dr. Yakin, Dr. DiBlase, and Dr. Froman. He also conducted a telephonic interview with Plaintiff. (R. at 582).

---

[2] Categories for various disorders are taken from 20 C.F.R. § 404, Subpart P, Appendix 1.

Plaintiff told Dr. Mehr that, as part of her activities of daily living, she takes care of her children, stays awake for days, requires reminders for appointments and medications, does not prepare meals, cleans her room, goes out only for appointments, drives, shops, manages money, watches TV and writes poems, does not spend time with others recreationally, and indicated difficulty with memory, completing tasks, concentration, and getting along with others." (R. at 582). Dr. Mehr indicated that he did not find claimant credible. He specifically noted inconsistencies in Plaintiff's account of her activities of daily living, and noted that her statements contradicted past statements of activities of daily living made to other consulting sources. (*Id.*).

Ultimately, he concluded that Plaintiff "retains the cognitive capacity needed to understand and remember instructions for simple jobs of a routine and repetitive type," and that she retains the ability to complete a normal work day at a "regular, minimally acceptable rate." Moreover, he concluded that she "retains the capacity to accept instructions, to tolerate supervision, and to get along with coworkers and peers." (R. at 586). He notes that Plaintiff "has limited social tolerance and would do best in a socially undemanding and restricted setting with reduced interpersonal contact away from the general public." (*Id.*).

### 5. *Hearing Testimony*

Plaintiff's hearing with the ALJ was held on April 12, 2012 in Hannibal, Missouri. (R. at 40). Plaintiff was represented by her attorney. A vocational expert also testified. (*Id.*). Plaintiff testified that she was born on February 8, 1985 and completed ninth or tenth grade. (R. at 44). She left school when she was sixteen,

after becoming pregnant for the first time. (R. at 45). She reported that she receives income through TANF and previously received child support. (*Id.*).

After asking introductory questions, the ALJ asked Plaintiff about her past interactions with the Illinois Department of Children and Family Services. Plaintiff told the ALJ that DCFS has gotten involved with her and her three children "like four times." (R. at 45-46). However, DCFS never removed her children. (R. at 47). The first time DCFS was involved was after Plaintiff was arrested. She reported that after her boyfriend cut off his house arrest bracelet and visited her, she lied to the police. (R. at 46). After they charged her with a felony for harboring a fugitive, her father reported her to DCFS. (*Id.*). DCFS concluded that the allegation of abuse or neglect was unfounded. (*Id.*). The second time, Plaintiff's home did not have running water for a time and her son's school called the DCFS. (R. at 47). DCFS also concluded that this complaint was unfounded. (*Id.*). The last two times, DCFS came because Plaintiff's boyfriend was a registered sex offender and she was living with him. (*Id.*). At the time of her hearing, Plaintiff was voluntarily no longer living with him. (*Id.*).

Plaintiff testified that she has had legal problems. (*Id.*). Although she testified that she has not been in prison, she testified that she has been on probation twice. (R. at 48).

During the hearing, the ALJ and Plaintiff discussed her work history since 1997. (R. at 48). Plaintiff said she worked at IHOP in 2004 for four months as a server, and she was fired "for calling in." (*Id.*). She described the work as stressful, said she needed to miss work because she needed to pick up her child, and said she

had been absent on two other occasions. (R. at 48-49). In 2005, she worked at McDonald's as a prep cook and cook for six months. (R. at 49). She lost that job after she was arrested. (*Id.*). In 2006, Plaintiff worked at Macomb Dining, where she "set up the salad bar and bussed tables and dishes." (*Id.*). She worked for a few months, took time off when she gave birth to her second son, and returned for a month before quitting. (*Id.*). She says she quit because "[t]he kitchen manager was propositioning" her. (*Id.*).

She testified that in 2007 she worked at IHOP, Steak and Shake for three months, and the Village Inn for three months. (R. at 50-51). Her job at the Village Inn ended because she "just didn't go back to work and . . . moved back home." (R. at 51). In 2008, Plaintiff worked at a factory called Whalen's, where she assembled blades for a month or two. (R. at 51). She left because she could not get along with the people on her line. (*Id.*).

Plaintiff testified that she leaves jobs because she feels "like all the people there are like judging me and I get, I feel like I'm in a box and I have to, I have to escape, like I have to go." (R. at 63).

Plaintiff reported that she moves frequently. She was in jail, "probably in 2009," after she was arrested for getting into a bar fight with her cousin. (R. at 53). After she left jail, she rented a home in Macomb, Illinois for a year. (R. at 52). Once that lease ended, she moved in Blandinsville, Illinois for four months. (*Id.*). She left that home because she could not afford to fix a damaged water heater, and moved to a home in Bardolph, Illinois. (*Id.*). Ten months later, just days before the hearing

with the ALJ, she left Bardolph because she "just had to move." (*Id.*). At the time

of the hearing, she was living in a trailer. (R. at 51).

Next, Plaintiff's counsel questioned her about her psychological treatment.

Plaintiff reported that her doctor is Gretchen Fawcett, whom she had been seeing

for approximately six months at the time of the hearing. (R. at 54). She reported she

had been seeing her counselor, Pam Helms, for three years, because she needed

help with her anger. (*Id.*). She began seeing Helms because she was "fighting people

and getting mad all the time and it was court ordered." (R. at 55). She would "just

get angry" when she looked at people and would "just get bad thoughts when

certain people would come around." (*Id.*).

Plaintiff testified that she saw two doctors who treated her for her anger

issues. One prescribed her medicine that made her angrier, so she stopped seeing

him and began seeing another doctor who prescribed "a mood stabilizer" and

"something for anxiety." (*Id.*). She testified that the mood stabilizer helps with her

anger, although "it doesn't take it completely away." (*Id.*). She said that Effexor

"makes me feel like I'm not going to explode, like I can actually cope with some

things." (*Id.*). She said that she has a difficult time staying in relationships and

dealing with her family, but the medication helps her with both. (R. at 57).

Plaintiff testified that she was diagnosed with bipolar disorder, which makes

her either sleep for long periods of time or stay awake for long periods of time. (*Id.*).

She said that the medicine is helping with symptoms and that it is not as bad as it

once was but that she sometimes stays awake for a day or two or has days when she

just stays in bed. (R. at 57-58). On days when she does not want to be around

anybody, she shuts her door and gets a babysitter (usually her mother or grandmother). (R. at 58-59). She estimated that she does this once or twice a month, and that it persists for "two, maybe three" days in a row when it happens. (R. at 58).

Plaintiff testified that she has three children, who were ten, five, and nine-months at that time. (R. at 45). She said her goal in life is to raise her children "to be something some day." (R. at 65). She testified that the oldest child is in fifth grade and was an A, B student and the middle child is five and attends head start. (R. at 65-66). She testified that her children have been in her mother's and grandmother's custody "off and on for the last ten years." (R. at 67). She testified that they had been in her custody for the past two years. (*Id.*).

After Plaintiff testified, the ALJ examined a vocational expert. (R. at 68). The vocational expert testified that Plaintiff could have learned how to do her past three jobs – working on an assembly line, as a busser, and as a waitress – in the time in which she had them. (R. at 69-70).

The ALJ then posed a hypothetical question to the vocational expert:

[A]ssume a younger individual under the age of 50 with a . . . limited ninth or tenth grade education, no GED, past work history [as an assembler, busser, and waitress], medium work, 50 pounds occasionally; 25 pounds frequently; standing and walking a total of six hours in eight; sitting a total of six; the person would need to change positions for, say, a minute or two every hour; no ladders, ropes, or scaffolds; and then the postural, all of these would be occasional, balancing, kneeling, crouching, crawling, stooping, and climbing ramps and stairs. Then the work should be simple, routine tasks that can be done independently that involve working primarily with things rather than people. Then beyond that, to the extent any social interaction would be required, it should be only with supervisors and co-workers and superficial, no negotiation confrontation, arbitration, mediation, or supervision of others; and no direct interaction with the general public. And let's start with that. Would such a person be able to do any of the past jobs?

18

(R. at 70-71).

The vocational expert responded that a person would be able to do either the assembly work or the bussing work. She estimated there are 4,200 bussing jobs in the St. Louis metro area and 402,000 nationally, and 7,000 assembling jobs in the metro area and 700,000 nationally. (R. at 71).

Next, the ALJ added to the hypothetical a requirement that the work be in a non-public setting. The vocational expert testified that such a requirement would eliminate the bussing position but leave the assembly job available. (*Id.*). The vocational expert then identified additional jobs that a person in the hypothetical could do, of which 2,500 exist in the St. Louis metro area and 211,000 exist nationally. (R. at 71-72). The vocational expert testified that these jobs would typically include a thirty-minute lunch break and two fifteen-minute breaks. (R. at 73). A person who had one could not be absent "more than once a month," and could not be regularly absent every month. (*Id.*). The vocational expert testified that a hypothetical person could not get into a physical or verbal confrontation at work and still keep the job. (*Id.*).

### 6. *The ALJ's Decision*

The ALJ issued his decision to deny Plaintiff's disability claims on June 26, 2012. (R. at 33). He concluded that Plaintiff met the insured status requirements; had not engaged in substantial gainful activity since May of 2008; and suffered from a number of severe impairments, including degenerative disc disease, obesity, bipolar disorder, intermittent explosive disorder, and borderline personality disorder. (R. at 22-23). However, the ALJ concluded that Plaintiff's impairments did

19

not meet or medically equal any of the listed impairments in the Code of Federal Regulations, and concluded that Plaintiff possessed the residual functional capacity necessary to perform medium work that consists of "simple routine tasks that can be performed independently and that involve working primarily with things rather than with other people." (R. at 23-24). The ALJ concluded that Plaintiff is unable to perform any of her past relevant work as an assembler, busser, or waitress. However, he also concluded that there are a significant number of jobs in the national economy that Plaintiff can perform. (R. at 31-32).

The ALJ considered Plaintiff's mental impairments under listings 12.04 and 12.08. *See* 20 C.F.R. § 404, Subpart P, Appendix 1, Listings 12.04, 12.08; (R. at 23). The ALJ concluded that Plaintiff met the Paragraph A criteria for each listing, and went on to consider whether Plaintiff met the Paragraph B criteria of each listing. Pursuant to regulations, the ALJ considered whether Plaintiff's disabilities caused four possible limitations: marketed restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (*Id.*). The ALJ concluded that Plaintiff's disability caused mild restrictions on her activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties with concentration, and no episodes of decompensation. (R. at 23). The ALJ based these conclusions on the fact that (1) Plaintiff lives with her three children and has not demonstrated that she has a difficult time caring for them, takes care of her own needs and hygiene, and can complete household chores; (2) Plaintiff gets along with her children and is able to

shop; and (3) Plaintiff watches television during the day, spends time on the computer, and can shop by herself. (*Id.*).

The ALJ concluded that Plaintiff had the residual functional capacity to conduct certain work. (R. at 25). After reviewing the evidence, he reasoned that although Plaintiff's impairments "could reasonably have been expected to produce the alleged symptoms," the "alleged intensity, persistence, duration, and impact on functioning are not credible or consistent with the totality of the evidence." (*Id.*). The ALJ reasoned that statements that Plaintiff gave to various consultative sources were inconsistent with her testimony at the hearing. For example, Plaintiff told Dr. Froman that she was likely to lose a job because she did not have a car and told Dr. Yakin that her status as a convicted felon made it difficult for her to find a job. (R. at 25, 27). Both were unrelated to her alleged symptoms. Plaintiff's reports of daily activities to consultative sources were also inconsistent with her testimony. (*Id.*). The ALJ also noted that Plaintiff's health records from North Central reflected an improvement of symptoms and noted success with medicine. (R. at 28, 30). Finally, the ALJ noted that Plaintiff's lack of inpatient hospitalization, the fact that she only saw her treating physician every three months, and the fact that she had not been prescribed the "psychotropic medications commonly known to be among the strongest," suggest that Plaintiff's symptoms were not as severe as she reported. (R. at 29).

The ALJ discounted the medical source statements provided by Pam Helms. (R. at 30). He noted that Helms is not an acceptable medical source and that no psychiatrist had co-signed the statement. (*Id.*). He also concluded that the

statement was inconsistent with mental status exams conducted by consultative psychologists and inconsistent with Plaintiff's medical records that showed some improvement in her symptoms and improvements with medication. He reasoned that the statements' conclusions are inconsistent with Plaintiff's lack of hospitalizations, lack of incidents of being jailed or incarcerated due to interpersonal difficulties, the lack of state involvement in Plaintiff's care and custody of her children, the daily activities of a single mother of three, and Plaintiff's testimony that she had never been fired from a job. (*Id.*). Finally, the ALJ concluded that the report was not reliable because Helm's demonstrated a willingness to speculate when she concluded that Plaintiff has been disabled since October 31, 2006 even though she did not begin treatment at North Central until 2008. (*Id.*). The ALJ also discounted statements provided by Plaintiff's grandmother and friend because they contradicted the medical evidence presented by the consultative sources. (*Id.*).

**LEGAL STANDARDS**

## I. *Standard of Review*

The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). "The standard of review that governs decisions in disability-benefit cases is deferential." *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). When a claimant seeks judicial review of an ALJ's decision to deny benefits, this Court must only "determine whether [the ALJ's decision] was supported by substantial evidence or is the result of an error of law." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). "The findings of the [Commissioner] as to any fact, if supported by

substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). "Substantial evidence, 'although more than a mere scintilla of proof, is no more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001) (citations omitted).

To determine whether the ALJ's decision is supported by substantial evidence, this Court will review the entire administrative record, but will not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). While this Court must ensure that the ALJ "build[s] an accurate and logical bridge from the evidence to his conclusion," he need not address every piece of evidence. *Clifford*, 227 F.3d at 872. The Court will remand the case only where the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## II. *Disability Standard*

To qualify for disability insurance benefits and/or SSI under the Social Security Act, claimants must prove that they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. §§ 416(i)(1), 1382c(a)(3)(A). Additionally, the impairment must be of a sort "which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(i)(1), 1382c(a)(3)(A). With respect to a claim for a period of disability and disability insurance benefits, claimants must also show that their earnings record has acquired sufficient quarters of coverage to accrue disability insurance benefits and

that their disability began on or before the date that insurance coverage ended. 42 U.S.C. §§ 416(i)(3), 423(c)(1)(B).

The Commissioner engages in a factual determination to assess claimants' abilities to engage in substantial gainful activity. *McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980). To do this, the Commissioner uses a five-step sequential analysis to determine whether claimants are entitled to benefits by virtue of being disabled. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1); *Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made as to whether the claimant is presently involved in any substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in such activity, the Commissioner then considers the medical severity of the claimant's impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the impairments meet the twelve-month duration requirement, the Commissioner next compares the claimant's impairments to a list of impairments contained in Appendix 1 of Subpart P of Part 404 of the Code of Federal Regulations and deems the claimant disabled if the impairment matches the list. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairments do not match the list, then the Commissioner considers the claimant's Residual Functional Capacity ("RFC")[3] and past relevant work. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If claimants are still able to perform their past relevant work, then they are not disabled and the inquiry ends. *Id.* If they are unable to perform their past relevant work, then the Commissioner considers the

---

[3] Residual Functional Capacity is defined as "the most [claimants] can still do despite [their] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

claimants' RFC, age, education, and work experience to see if they can transition to other work. *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If a transition is not possible, then the claimant is deemed disabled. *Id.*

The plaintiff has the burden of production and persuasion on the first four steps of the Commissioner's analysis. *McNeil*, 614 F.2d at 145. However, once the plaintiff shows an inability to perform any past relevant work, the burden shifts to the Commissioner to show an ability to engage in some other type of substantial gainful employment. *Id.* (citing *Smith v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 857, 861 (7th Cir. 1978)).

## DISCUSSION

In her Motion for Summary Judgment, Plaintiff raises two arguments. First, she argues that the ALJ erred in refusing to give the opinion of Pam Helms controlling weight. Second, she argues that the ALJ erred in finding that Plaintiff's mental impairments do not meet a listing of impairment under listings 12.04 or 12.08. For the reasons explained below, each contention is insufficient to remand this case to the ALJ.

### I. Weight of Evidence from Plaintiff's Treating Counselor

Plaintiff first argues that the ALJ erred by according more weight to the opinion of the consulting psychologist than to her counselor, Pam Helms. (Doc. 11 at 8). Specifically, Plaintiff argues that the ALJ should have given Helms's opinion controlling weight. (*Id.* at 10).

The fact that Helms has a more developed relationship with Plaintiff than consultative sources is not reason to give her opinion controlling weight. Guidance

from the Social Security Administration recognizes that due to "the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as . . . licensed clinical social workers have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." SSR 06-03p, 2006 WL 2329939, *3 (Aug. 9, 2006). Therefore, it notes that opinions from these sources "are important and should be evaluated on key issues such as impairment severity and functional effects." *Id.* Contrary to Plaintiff's contention, however, SSR 06-03p does not instruct ALJs to give controlling weight to the opinions of other sources that provide primary treatment to claimants. In fact, it says exactly the opposite, reiterating that only acceptable medical sources can provide medical opinions that might be entitled to controlling weight. *Id.*

As the regulations make clear, the ALJ could not give Helms's opinion controlling weight. The governing regulations require ALJs to give controlling weight to a treating source's opinion when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, only "acceptable medical sources" can provide medical opinions, *see* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2), and only the medical opinions of "acceptable medical sources" are entitled to controlling weight. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also* SSR 06-03p.

Plaintiff concedes that Ms. Helms is not an "acceptable medical source," as defined by regulation, but is instead an "other source." (Doc. 11 at 8). "Other sources" include medical sources that are not considered "acceptable medical sources," such as "nurse-practitioners, physicians' assistants, . . . and therapists." 20 CF.R. §§ 404.153(d), 416.913(d). Therefore, the ALJ did not err in refusing to give Helms's opinion controlling weight.

However, ALJs are not permitted to simply disregard evidence even if it is not controlling. SSR 06-03p reiterates requirements in 20 C.F.R. §§ 404.1527(b) and 416.927(b) that ALJs consider "all relevant evidence in the case record," and suggests that ALJs might apply factors ordinarily reserved for acceptable medical sources in evaluating opinion evidence from "other sources." *See* SSR 06-03p at *4-6; 20 C.F.R. §§ 404.1527(d), 416.927(d). Having done so, the ALJ may decide that the opinion of a therapist like Helms outweighs the opinion of acceptable medical sources, including treating sources. SSR 06-03p at *6. ALJs should consider a number of factors, including the length of time a source has known a social security claimant and seen the claimant, the consistency of the source's opinion with other evidence, the degree to which a source presents relevant evidence to support an opinion, how well the source explains the opinion, whether the source has a specialty or area of expertise that is relevant to the claimant's impairments, and any other facts that tend to support or refute the source's opinion. *See id.*

Although Plaintiff has challenged the ALJ's decision to not accord Helms's opinion controlling weight, she has not challenged the particular reasons that the

ALJ provided when deciding to give Helms's report little weight.[4] Because Plaintiff

has failed to develop an argument that the ALJ erred in his reasons for discounting

Helms's opinion, she has waived that argument. *See Webster v. Astrue*, 580 F. Supp.

2d 785, 794 (W.D. Wis. 2008); *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001).

The Court, however, notes that the ALJ provided a number of compelling

reasons for failing to credit Helms's report. (*See* R. at 30). For example, the ALJ

noted that Helms's opinions were inconsistent with the opinions of the consultative

psychologists, Plaintiff's treatment records and Plaintiff's own claims which

indicate that her symptoms have improved with medication, Plaintiff's lack of

inpatient hospitalizations, the lack of state involvement in her care and custody of

---

[4] Plaintiff does suggest that the ALJ erred by taking notice of the fact that Plaintiff frequently missed scheduled appointments with Helms. (*See* Doc. 11 at 14). Plaintiff argues that her "inability to keep appointments is both a symptom of her mental illness and an aggravating factor." (*Id.*, citing *Punzio v. Astrue*, 630 F.3d 704,711 (7th Cir. 2011)). This argument is undeveloped, however, and appears to challenge the ALJ's assessment of Plaintiff's limitations rather than challenge the ALJ's assessment of Helms's opinions. Moreover, the case she cites is inapposite to this one. In *Punzio*, an ALJ concluded that an examining physician's opinion that a claimant's "mental limitations will cause frequent absenteeism" had no support in the record. 630 F.3d at 711. The Seventh Circuit, however, concluded that there was support for this conclusion, as "the psychiatric treatment notes [were] replete with references to missed appointments." *Id.* In this case, the ALJ wrote that "[i]t is also noteworthy that the claimant has not been regularly attending her scheduled appointments." (R. at 30). However, unlike in *Punzio*, this observation was not made in an effort to discount specific findings made by Helms. *See id.* Although Plaintiff's missed appointments might be relevant to her impairments, Helms did not opine on any ways in which they could be. (*See* R. at 673-75, 679-81). Plaintiff's missed appointments are also relevant to the amount of weight that ALJs should accord to treating physicians and other sources. *See* SSR 06-03p at *4 (identifying the length of time a source has known a claimant and the frequency with which the source has seen the claimant as a relevant factor when considering opinion evidence). Therefore, the Court cannot conclude that the ALJ erred in considering Plaintiff's treatment history with Helms when he chose to discount Helms's opinion.

her children, her reported daily activities, and her testimony that she had never been fired from a job. (*See* R. at 30).

To be sure, some of the ALJ's reasons for failing to credit Helms's report do not find support in the record. For example, there is evidence that Plaintiff was jailed or incarcerated due to interpersonal difficulties, as she testified that she was incarcerated after she got into a bar fight with her cousin. (R. at 53). However, the vast majority of the ALJ's analysis finds support in the record. The ALJ indicated that the most important reasons that he discounted Helms's opinion are that it was inconsistent with Plaintiff's case notes at North Central and inconsistent with that of consultative sources. (R. at 30). Importantly, Plaintiff's case notes include Plaintiff's own, most recent, report to Helms from January 2012 that she was compliant with her medications and that Xanax and Effexor really help her stay calm. (*See* R. at 745). This analysis would be enough to overcome Helms's opinion even if she was an acceptable medical source whose opinion might be entitled to controlling weight. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (explaining that an ALJ "may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."). For that reason, the Court concludes that any error the ALJ may have made in assessing Helms's credibility was harmless. *See Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013)(explaining that a federal court should not "remand a case to the ALJ for

further explanation if [it] can predict with great confidence that the result on remand would be the same.").

The ALJ did not discredit Helms's opinion by relying upon a subset of hopeful remarks contained in the medical records. In the past, the Seventh Circuit has criticized ALJs for discounting the opinions of treating physicians on the basis of "a number of hopeful remarks" contained in treatment notes. *See Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). In *Bauer*, an ALJ discounted a treating physician's opinion simply on the basis of those treatment notes, explaining that reports that a patient is "doing 'fairly well'" or that her "reported level of function was found to have improved," cannot on their own demonstrate that a patient is functional because "[a] person who has a chronic disease . . . and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days." *Id.*

Here, however, the ALJ's analysis focused on the overall record rather than relying upon stray remarks. *See id.* The ALJ did identify a number of statements indicating that Plaintiff's symptoms had improved as a way of discounting Helms's opinion. For example, Helms's colleague, Dr. Sheth, regularly reported that Plaintiff was doing somewhat better and Plaintiff also reported the relative effectiveness of her medication, noting when it was working and when it was not working. (*See* R. at 28, 489, 499-500). Perhaps the hopeful notes contained in Plaintiff's medical records do not, alone, provide good reason to discredit Helms's opinion. *See Bauer*, 532 F.3d at 609. However, the hopeful notes in Plaintiff's medical records are consistent with Plaintiff's reported daily activities, the conclusions of non-treating sources who concluded that Plaintiff's symptoms were not so severe, the frequency of Plaintiff's

office visits with her treating physicians, and the types of medication her physicians had prescribed. (R. at 27-30). These factors, when viewed together, provide an adequate explanation for discounting Helms's statement. *See Schreiber v. Colvin*, 519 F. App'x 951, 958 (7th Cir. 2013)(concluding that ALJ provided adequate reason for discounting treating physician's opinion on the basis that the assessment was inconsistent with positive treatment notes, the level of treatment provided, the claimant's reported activities of daily living, and opinions of other physicians).

For these reasons, the Court concludes that the ALJ did not err when he did not give Pam Helms's opinion controlling weight or err in his decision to accord little weight to her opinion.

## II. Plaintiff's Mental Impairments

Plaintiff's second contention is that the ALJ erred at step three of the sequential evaluation process by finding that Plaintiff does not have an impairment or combination of impairments that meet or equal a listed impairment. Plaintiff asserts that her impairments were medically equivalent to the listing for affective disorders and personality disorders. *See* 20 C.F.R. § 404, Subpart P, App. 1, Listings 12.04, 12.08. As relevant to this case, to satisfy these listings claimants must have a medically documented impairment (known as the "A" criteria) that results in two of four functional limitations (known as the "B" criteria): marked restriction of daily living activities, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. *See id.*

In this case, the ALJ concluded that Plaintiff's ailments meet the A criteria, but the severity of her ailments do not meet any of the limitations listed in paragraph B. (R. at 23). The ALJ concluded that Plaintiff had mild restrictions in daily living, moderate difficulties in social functioning, and moderate difficulties with regard to concentration. (*Id.*).

Plaintiff argues that the ALJ erred in three ways in concluding that she did not satisfy the criteria of paragraph B: first, the ALJ employed faulty logic; second, the ALJ cherry-picked evidence; and third, the ALJ did not accept the opinion of Pam Helms. Defendant counters by arguing that Plaintiff failed to present "specific medical findings that satisfy <u>all</u> of the criteria of the particular listing." (Doc. 15 at 5). Defendant argues that because Plaintiff failed to "meet her burden to demonstrate with acceptable medical evidence that she met all of the requirements of either Listing 12.04 or 12.08," she cannot as a matter of law establish that she was disabled under step three. (*Id.* at 6).

Defendant's argument is contrary to the Social Security Administration's regulations and guidance. In considering whether a claimant's impairment "medically equals a listing," the Social Security Administration must "consider all evidence in [the claimant's] case record about [her] impairment and its effect on [her] that is relevant to this finding." 20 C.F.R. 404.1526(c). The listings at issue in this case can only be met if a claimant provides evidence of both an impairment and evidence of the impairment's functional limitations. *See* 20 C.F.R. § 404, Subpart P, App. 1, Listing 12.00. Paragraph A of listings 12.04 and 12.08 require that a claimant "substantiate medically the presence of a particular mental disorder,"

while paragraphs B and C "describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity." *See id*.

A claimant must provide "medical evidence consisting of signs, symptoms, and laboratory findings" to establish the listing's Paragraph A criteria. *See* 20 C.F.R. §§ 404.1508, 404.1528. However, claimants need not provide medically acceptable evidence to establish that they meet the criteria of Paragraphs B and C. Because Paragraphs B and C concern the severity of a claimant's impairment and the ways in which a claimant's impairment affect the claimant's ability to function, the Social Security Administration can consider evidence from other sources. *See* SSR 06-03p at *2.

Therefore, the Court must consider Plaintiff's arguments concerning the ALJ's logic in determining that she did not meet either listing 12.04 or 12.08.

## A. The ALJ's logic

Plaintiff argues that none of the purported reasons for concluding that she does not meet the paragraph B criteria are legitimate. The ALJ concluded that Plaintiff only has mild limitations in daily living because she is a single mother who can do household chores; only has moderate limitations in social functioning because she gets along with her kids and admits to shopping; and only has moderate limitations in concentration because she is able to engage in simple, routine tasks like watching television, spending time on the computer, and shopping. (R. at 23). He incorporated his findings regarding Plaintiff's residual capacity function at step four into his findings with respect to the B paragraph criteria. (R. at 24). Plaintiff argues that the ALJ should not have relied upon the

fact that Plaintiff could shop and care for her household, care for her children, and get along with her children. (Doc. 11 at 10-11).

Each of Plaintiff's arguments either misstates evidence or misapplies law. Plaintiff first argues that the ALJ improperly generalized certain activities, like shopping and taking care of household chores, and did not properly limit evidence of shopping and taking care of household chores to activity that occurs during her good days. (Doc. 11 at 10). In concluding that Plaintiff's daily chores and the fact that she shops were evidence that her impairments did not markedly affect her functionality, the ALJ did not rely upon "a snapshot of any single moment," but rather relied upon statements that Plaintiff made to consultative sources regarding her activities of daily living. *See Punzio*, 630 F.3d at 710. In *Punzio*, the Seventh Circuit criticized an ALJ for discrediting the opinion of a claimant's treating physician by "cherry-picking [the doctor's] file to locate a single treatment note that purportedly undermines her overall assessment of [the claimant's] functional limitations. . ." *Id.*

Here, rather than relying upon a single note that Plaintiff engaged in these activities in order to discredit a treating physician, the ALJ relied upon reports made by a number of consultative sources that spoke in general terms about Plaintiff's abilities. For example, the ALJ specifically relied upon Dr. Yakin and Dr. Mehr's reports. (R. at 27-28, 29). Plaintiff told Yakin that she "gets up at 7:00 a.m. each morning," that she is "able to" cook, wash dishes, clean, vacuum, do laundry, take care of her children, and go shopping alone." (R. at 27-28; 565). She reported more limited daily activities to Dr. Mehr, but again noted that she could take care of her children, clean her room, drive, and shop. (R. at 582). Moreover, these

observations supported Dr. Mehr's conclusion that Plaintiff did not suffer from marked functional limitations (R. at 586), and do not contradict the opinion of Plaintiff's treating physician, as Plaintiff has not provided any. Therefore, the ALJ did not commit the sort of error that the ALJ committed in *Punzio*, and Plaintiff's criticisms are misplaced. See *Punzio*, 630 F.3d at 710.

Plaintiff next argues that it was improper to equate the fact that Plaintiff can do housework or the fact that she takes care of her children with the idea that she is capable of doing work in the labor market. In *Gentle v. Barnhart*, the Seventh Circuit criticized an ALJ who concluded that a woman who suffered from a physical disability could work because she conducted household work. 430 F.3d 865, 867 (7th Cir. 2005). In that case, a woman with a spinal injury took care of her children, a fact that Judge Posner characterized as both necessary and heroic. *Id.* Judge Posner also concluded that such a comparison was improper because of the help that the plaintiff received. *Id.*

In this case, however, the ALJ marshalled this evidence differently than the ALJ in *Gentle*. Here, the ALJ concluded that the fact that Plaintiff could care for her three children would require interaction with myriad outsiders, and also shop, another task that inevitably would require interaction with outsiders. (R. at 29). The ALJ did not conclude that the housework that Plaintiff is able to do is somehow equivalent to work in the labor market. *See Gentle*, 430 F.3d at 867. Rather, the ALJ relied upon this evidence to conclude that Plaintiff is capable of interaction with others, including co-workers or supervisors. (R. at 29). Such a conclusion is

categorically different than the conclusion that the ALJ reached in *Gentle*. *See* 430 F.3d at 867.

Plaintiff also criticizes the fact that the ALJ did not discount the fact that she can take care of her children by recognizing that she requires assistance in taking care of them. A determination that lacks support in the record is patently wrong. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). In her brief, Plaintiff points to evidence that her father cared for her children on many occasions, (Doc. 11 at 10, citing R. at 415), and also criticizes the ALJ for failing to mention that Plaintiff's mother and grandmother also often care for her children. (Doc. 11 at 11).

Although the ALJ did not mention this evidence in his decision, he did consider Plaintiff's testimony that she sometimes had difficulty caring for her children on her own, including testimony that she would "get[] a babysitter sometimes for a week or a couple days, 2 times per month, for 2-3 days." (R. at 25). There is also ample evidence in the record that Plaintiff could care for her children. She herself said so to consulting sources, including Dr. Yakin (R. at 565), and she also testified that the state had never intervened in her custody of her children. (R. at 45-47). In reaching his conclusion that Plaintiff could care for her children, the ALJ relied upon this evidence. (*See* R. at 27-28, 29).

This evidence is substantial enough that a reasonable mind might accept [it] as adequate to support a conclusion." *Kepple*, 268 F.3d at 516. Here, Plaintiff is asking the Court to reweigh the evidence, resolve conflicts, and substitute its own judgment for that of the Commissioner. That's something that the Court will not do. *See Clifford*, 227 F.3d at 869. Rather, the Court's task is to ensure that the ALJ

built an "accurate and logical bridge from the evidence to his conclusion." *Id.* at 872. Here, the ALJ's conclusion that Plaintiff was able to adequately care for her children without difficulty is supported by the evidence in the record and this evidence logically supports his conclusion that Plaintiff's functionality was not markedly limited by her impairments. *See Steele*, 290 F.3d at 940.

Finally, Plaintiff argues that it is inappropriate to analogize her relationship with her children to her ability to get along with people who are not her children. In *Larson v. Astrue*, 615 F.3d 744 (7th Cir. 2010), Judge Wood concluded that an ALJ erred by discrediting a plaintiff's claim that she was afraid to go out in public on the basis that that she had a few close friendships. *Id.*at 752. As discussed above, however, this is not the way in which the ALJ marshalled the evidence that Plaintiff got along with her children. Rather than pointing to a few close relationships, the ALJ considered both Plaintiff's relationship with her children and also considered the various social interactions that Plaintiff would need to have with other people in order to care for her children. *See id.* at 752, (R. at 29). This includes her children's "teachers, bus drivers, other school officials, or treating medical sources for her children." (R. at 29). Collectively, the ALJ suggested that this evidence "does not support a conclusion that the claimant can only be in work or other settings that involve no interaction whatsoever . . . to any other individuals." (*Id.*).

For these reasons, the Court is unable to conclude that the ALJ employed faulty logic in concluding that Plaintiff's functional limitations did not meet Listings 12.04 and 12.08. Rather, the ALJ built a logical bridge from the evidence in the

record to his conclusion. Therefore, these reasons are insufficient for the Court to remand this matter to the ALJ.

**B. Cherry-Picked Evidence**

Plaintiff next argues that the ALJ cherry-picked evidence that tended to show that she was not eligible for benefits while giving little weight to evidence that was favorable to her case. (Doc. 11 at 13). In support of this evidence, Plaintiff identifies a string of Plaintiff's Global Assessment of Functioning (GAF) scores over a four year period that the ALJ did not discuss.

In his decision, the ALJ paid very little attention to Plaintiff's GAF scores. The ALJ noted that in May of 2007, Dr. Froman "rated her [GAF] at 60, which is indicative of only moderate limitations in social functioning." (R. at 26). However, the ALJ did not address any of Plaintiff's other GAF scores, many of which were included in the medical records from North Central. Between April 2008 and December 2011, Pat Helms assessed Plaintiff's GAF on at least seven occasions. Each time, she assessed it at between 46 and 48. (*See* R. at 431,441, 468, 663, 728, 758, 765). Two physicians at North Central also assessed Plaintiff's GAF. Dr. Wright assessed it at 53 on July 3, 2008 (R. at 433), and Dr. Sheth assessed it at 48 in August and October of 2009. (R. at 478, 497). Scores between 41 and 50 reflect either serious symptoms or any serious impairment in social, occupational, or school functioning. Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (Text Revision, 4th ed. 2000).

GAF scores are "useful for planning treatment," and are measures of a person's severity of symptoms and functional level. *Denton v. Astrue*, 596 F.3d 419,

425 (7th Cir. 2010)(citing Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (Text Revision, 4th ed. 2000)).[5] GAF scores reflect the worse of a person's severity of symptoms and functional level. *Denton*, 596 F.3d at 425. For that reason, a GAF score "does not reflect the clinician's opinion of functional capacity." *Id.*

"A low GAF score alone is insufficient to overturn an ALJ's finding of no disability." *Bates*, 736 F.3d at 1099. However, an ALJ's failure to consider conflicting GAF scores may be problematic. *See Walters v. Astrue*, 444 F. App'x 913, 918 (7th Cir. 2011). In *Denton*, the Seventh Circuit held that an ALJ did not err by refusing to consider an "unexplained numerical [GAF] score assigned by [a physician]" and instead relying upon a "narrative finding" by the same physician that "substantially supported" the ALJ's conclusion that the claimant had no significant impairments. *Denton*, 596 F.3d at 425. However, in *Yurt v. Coleman*, 758 F.3d 850 (7th Cir. 2014), the Seventh Circuit held that an ALJ erred by adopting the findings of a non-examining psychologist who relied upon a single GAF score in concluding that the claimant had minimal impairments. *Id.* at 859. In that case, the non-examining physician considered the fact that the claimant's examining physician assigned a GAF of 60, but ignored the fact that another examining physician assigned two GAF scores – one of 25 to 30 and the other of 35-50 – just two weeks later. *Id.* The court faulted the ALJ for adopting the non-examining

---

[5] The American Psychiatric Association no longer uses the GAF as a metric. *See* Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 16 (5th ed. 2013). However, professionals used GAF scores during Plaintiff's treatment, so they are relevant to the ALJ's decision. *See Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013).

psychologist's opinion, which "[s]eized upon" the higher GAF, not because of the "failure to individually weigh the low GAF scores," but instead because of a "larger general tendency to ignore or discount evidence favorable to [the claimant's] claim, which included GAF scores from multiple physicians suggesting a far lower level of functioning." *Id.* at 859-60.

The ALJ did not commit clear error in this case. First, although the ALJ referenced Dr. Froman's assessment of Plaintiff's GAF, he did not "seize upon it" to conclude that Plaintiff did not have marked impairments at the expense of other indicators suggesting otherwise. *See id.* at 859. Instead, the ALJ used Dr. Froman's report as one piece of evidence that contradicted Plaintiff's claims of her functional limitations. (*See* R. at 25-26). The ALJ also considered the opinions of Dr. Yakin (R. at 27-28) and Dr. Mehr (R. at 29), each of whom reviewed Plaintiff's medical records from North Central that contained lower GAF scores. (*See* R. at 563, 582). Moreover, the ALJ also considered the treatment notes from Dr. Wright, Dr. Sheth, and Pam Helms. (*See* R. at 26, 27, 28, 30). Although these notes included GAF scores, the scores were presented without any explanation. (*See, e.g.,* R. at 433). Rather than relying upon unexplained GAF scores that were included as part of those treatment notes, the ALJ focused his analysis on the recorded clinical observations. (*See* R. at 26, 27, 28, 30.). Therefore, the ALJ's omission of these GAF scores is not indicative of an ALJ who failed to consider evidence. *See Bates*, 736 F.3d at 1099; *Walters,* 444 F. App'x at 918 (criticizing ALJ for cherry picking high GAF scores and noting that "nothing in the RFC leads us to believe that the ALJ accounted for" the opinion of the doctor providing a lower GAF). Rather, the ALJ's

treatment of Plaintiff's GAF scores resembles the treatment in *Denton*, where the ALJ's finding was "substantially supported by [a physician's] narrative finding," even though the recorded GAF scores might have suggested otherwise. *See* 596 F.3d at 425. For that reason, the Court concludes that the ALJ did not err by not mentioning or individually weighing low GAF scores assigned by Wright, Sheth, or Helms.

### C. Helms

Finally, Plaintiff argues that the ALJ should have credited Helms's medical source statements, and adopted her opinion that Plaintiff met listings 12.04 and 12.08. However, as discussed above, the ALJ concluded that these medical source statements were not credible and he provided a thorough explanation for electing to accord them little weight. (R. at 30). Specifically, the ALJ concluded that the reports were contradicted by the opinions of other professionals, were inconsistent with the record, and undermined by Helms's purported willingness to speculate. (*See id.*).

By asking the Court to accept Helms's opinion over the other evidence, Plaintiff is essentially asking that the Court "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford*, 227 F.3d at 869. However, courts "will not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). As explained above, Plaintiff has not challenged the bases of the ALJ's credibility determinations and the Court concludes that the ALJ's logic was not patently wrong. *See supra* at 28-32.

## Conclusion

For the foregoing reasons, the Commissioner's decision denying disability benefits is affirmed. IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 11) is denied, and Defendant's Motion for Summary Affirmance (Doc. 14) is granted.

CASE TERMINATED.


Entered this 17th day of February, 2015.


                                               s/Joe B. McDade
                                               JOE BILLY McDADE
                                   United States Senior District Judge